IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, DAVID REGAN and ELISEO MEDINA, as trustees for SEIU UNITED HEALTHCARE WORKERS-WEST and fiduciaries of the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND, SEIU UNITED HEALTHCARE WORKERS-WEST, an unincorporated association and fiduciary of the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND, and REBECCA COLLINS, as a participant in the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND,<br><br>  Plaintiffs,<br><br>  v.<br><br>SAL ROSELLI, JORGE RODRIGUEZ, JOAN EMSLIE, JOHN BORSOS, JOHN VELLARDITA, GABE KRISTAL, PAUL KUMAR, MARTHA FIGUEROA, BARBARA LEWIS, PHYLLIS WILLETT, DANIEL MARTIN, LAURA KURRE, RALPH CORNEJO, WILL CLAYTON, GLENN GOLDSTEIN, FRED SEAVEY, MARK KIPFER, AARON BRICKMAN, IAN SELDEN, GAIL BUHLER, FREJA NELSON, ANDREW REID, NATIONAL UNION OF HEALTHCARE WORKERS; MARYRUTH GROSS, CONNIE WILSON, ARLENE PEASNALL, CHERIE KUNOLD, FAYE LINCOLN, and DOES 1 through 100, inclusive,<br><br>  Defendants. | No. C 09-00404 WHA<br><br>**TEMPORARY RESTRAINING ORDER AND SCHEDULE LEADING UP TO HEARING ON PRELIMINARY INJUNCTION MOTION** |

   In this controversy between an international union and a splinter group organizing a new and competing union, the immediate issue concerns restoration of the international's property

United States District Court

For the Northern District of California

and information so that it can protect its members. A temporary restraining order is now sought by the international union. After a two-day evidentiary hearing, among other related hearings, the motion is **GRANTED IN PART** as follows.

*       *       *

The United Healthcare Workers have been part of the Service Employees International Union since the 1930's. In recent years, however, the leaders of the SEIU and the leaders of the UHW have disagreed over policy matters. This culminated in a trusteeship being imposed on UHW as of January 27, 2009, pursuant to the SEIU constitution. In the run-up to the trusteeship, UHW leaders girded themselves to resist a trusteeship and to undermine the ability of any trustee to govern, *i.e.*, to orchestrate an "ungovernable" situation, as one defendant UHW leader put it in a memo. As the potential trusteeship loomed larger and larger, they allowed stewards and rank-and-file members to organize vigils inside the union offices. Their purpose was to physically resist efforts by any trustee to take the reins of management.

When the trusteeship was approved and imposed on January 27, the trustees relieved the individual defendants of management responsibility. In response, the individual defendants went a step further and resigned completely from the union. Immediately, they formed the National Union of Healthcare Workers, a new and competing labor association. In several instances, they departed the offices, knowing that the offices were occupied by the stewards and some rank-and-file who had barricaded themselves inside to resist a trusteeship. Credible evidence has been provided that those remaining inside removed or destroyed records and information.

While all individual defendants may not have expressly ordered the havoc or participated personally in it, it seems plain that the individual defendants anticipated the likely course of events once a trusteeship came down afterward, they simply walked away, letting the havoc unfold and, indeed, expecting it to happen. Beyond this, as the trusteeship lurked on the horizon, almost all of the individual defendants established a shadow email system using personal PDAs. Through this system, they discussed how UHW should and would resist the

2

1 international. And, as the eventful day approached, at least one individual defendant emailed
2 UHW documents to his personal account for further use.
3 　　　　In short, even at this early stage, considerable and convincing evidence shows that,
4 when the SEIU threatened to impose a trusteeship under the union constitution, the then-leaders
5 of UHW — now the individual defendants — embarked on a vigorous resistance strategy,
6 including a plan to disrupt union operations so as to make the situation ungovernable.
7 When SEIU finally imposed a trusteeship, defendants walked away immediately and, one day
8 later, formed a rival union, namely the NUHA. Forming a new union after the fact, of course,
9 was lawful. What was not lawful, however, was filching or sabotaging of UHW property and
10 information or aiding and abetting others in doing so.
11 　　　　　　　　　　　*　　　　　*　　　　　*
12 　　　　This order is anchored in the principle that all communications, information or property
13 made or acquired by any officer or employee of UHW in the course of their employment
14 belongs to UHW. This would include notes, emails, letters, memos, forms, post-its, badges,
15 photographs and so on — any *information*, however recorded, and any *property*, however
16 embodied. This would also include any and all information pertaining to the UHW resistance
17 scheme, for all of that was — up until the moment of the trusteeship and notice thereof — done
18 in the course of employment for UHW.
19 　　　　Defendants have drawn a distinction between "official property" versus all other
20 materials. This is a counterfeit distinction. *Any* information generated by a UHW employee
21 or agent in the course of his or her UHW employment, including information regarding how
22 UHW should resist any trusteeship efforts, *belongs to UHW*, not to the individual employees
23 or agents. Although new management has assumed control of UHW (and has done so through
24 a process of uncontested legitimacy), the change in management does not change the fact that
25 UHW still owns the information and is entitled to get it back — even if it means that UHW's
26 new management will learn of the details of the resistance scheme. Nor does informality
27 matter. It does not matter that UHW information was placed on informal notes or placed by
28 defendants on private cell phones or Blackberries (or other PDAs). *Any* information recorded

in *any* manner in the course of UHW employment, including UHW efforts to resist any trusteeship, belonged to UHW at the time and *still* belongs to UHW today.

With this in mind, certain terms used in this order will be understood to mean as follows. "UHW information" means information communicated or acquired by any UHW officer or employee in the course of his or her employment. "Electronic UHW information" means such information stored in electronic form, such as e-mails, text messages, voice mails, digital photographs or videos and word-processed documents. "Non-electronic UHW information" means all other UHW information. "UHW property" includes all "UHW information" as well as any other item purchased with UHW funds or acquired for UHW purposes by any officer or employee of UHW.

The record clearly shows that UHW information and property were removed from or hidden within various UHW offices in the wake of the trusteeship. There is much evidence that at least some of them were removed or hidden by confederates of the individual defendants whom they allowed to seize the offices in protest to an impending trusteeship. If defendants did not themselves take or hide the missing materials, then it seems probable that many materials were taken or hidden by their confederates with their tacit blessings.

If defendants have commingled UHW property with their own personal property — such as by using their private PDAs to do UHW work — that is a problem of their own making and is no defense to having to return the UHW information and property. Although this order will provide an opportunity to sort the private material from UHW material, the main burden and cost of doing so should fall on those who commingled in the first place rather than on UHW.

Nor does it matter that a UHW server may have backed up some emails or other electronic information. It did not do so for all. While it is true that most of the emails are not as important to recover immediately as are the grievance and collective bargaining files, the emails may help show what became of those critical files and who last had them. So the emails are of urgency as well as an evidentiary avenue to locate the grievance and collective bargaining files.

4

To be sure, *some* of the records may be missing because of plaintiffs' own mismanagement and confusion over records after the trusteeship began. This fact, however, does not eclipse the main conclusion that other materials were taken or hidden by individual defendants or by their confederates. For example, some grievance files and collective bargaining files were plainly taken away from some locations by dissidents. UHW needs the materials back to run the union and to protect its members. Accordingly, a sufficient record has been made to warrant the limited relief set forth below.

\*          \*          \*

While this order is intended to deny defendants any direct access to UHW property and information, it does not go so far as to bar defendants from "using" such information, at least at the TRO stage. There are several reasons for stopping short. Once the materials (and all copies) are returned, much of it will still be mentally remembered by defendants. In this limited sense, they will be allowed to use the information to build a rival union, for much of the information would have been remembered by defendants even if they had faithfully turned over all UHW property when they left. They cannot be expected to wipe their minds clean. For example, surely they would have known who were already union members and would have known from experience which members could be counted on to go an extra mile. It would be unfair to bar defendants from using information they would have remembered even if they had behaved correctly. Much of the information, moreover, is also in the public domain or widely known or, at the very least, has not been shown to be a true trade secret. Forms, badges, checklists, fliers, images of public events are some examples. It would be wrong to deny defendants the right to use information they could have acquired with only minimal effort from other readily available sources. And, to grant an injunction against "use" would lead to interminable contempt motions. These would be difficult to sort out, involving as they would issues of mental state and the considerations above. They would consume resources worth far more than any practical point at stake. The two sides are locked in a struggle for the hearts and minds of the rank and file. Industrial democracy is at work. A constant stream of litigation motions as to whether defendants have been mentally trying to remember what names were on

5

various lists and memos would, without advancing any practical point of ownership, unduly chill the organizing rights of defendants. Finally, we must bear in mind that plaintiffs' most pressing point of irreparable injury is their loss of grievance and collective bargaining files, which are needed for the ongoing — even immediate — representation of union members. Requiring these to be returned will aid that cause. Requiring defendants to forget what was in those files will not.

To be very clear, defendants may not retain electronic or hard copies and "use" those materials. They may only "use" what they happen to have remembered and must return *all* embodiments of UHW property and information.

\*          \*          \*

This is a Section 301 action to enforce the following provision in the SEIU constitution:

> *Article VIII, Section 7(b)*: "The Trustee [appointed pursuant to Section 7(a)] shall be authorized and empowered to take full charge of the affairs of the Local Union or affiliated body and its related benefit funds, to remove any of its employees, agents and/or trustees of any funds selected by the Local Union or affiliated body and appoint such agents, employees or fund trustees during his or her trusteeship, and to take such other action as in his or her judgment is necessary for the preservation of the Local Union or affiliated body and for protection of the interests of the membership."
>
> *Article VIII, Section 7(c)*: "Upon the institution of the trusteeship, all moneys, books and property of the Local Union or affiliated shall be turned over to the Trustee."
>
> *Article VIII, Section 7(e)*: "The Trustee shall take possession of all the funds, books, papers and other property of the Local Union or affiliated body . . . ."

Contrary to defendants, a Section 301 claim may be asserted against *individual* defendants so long as only *injunctive* relief is sought, as here. While the Ninth Circuit has not definitively ruled on the issue, the *Reis* decision barred only *damage* claims against individuals under Section 301. This order is limited to *injunctive* relief.

\*          \*          \*

Based on the extensive record and the multiple hearings, including live witness examination at a two-day evidentiary hearing, this order finds that plaintiffs have established a likelihood of success on the merits as well as a likelihood of irreparable injury should relief be

6

denied. It is worth pointing out, however, that virtually all of the following relief can be and is alternatively based on the district court's authority to manage civil discovery, including the preservation of evidence, independent of the merits and the usual provisional relief standards. Consequently, the NUHA and the individual defendants listed below are ordered to do the following pending resolution of the motion for a preliminary injunction:

    1.    Until the evidence is turned over as set forth below, defendants must preserve any and all UHW property within their possession, custody and control and to continue to comply fully with Paragraph 4 of the Supplemental Order to Order Setting Initial Case Management Conference in Civil Cases Before Judge William Alsup (an order both sides must honor).

    2.    Defendants must return immediately to UHW all non-electronic UHW information and copies thereof without making further copies. This should be done through Attorney Dan Siegel. Full turnover to plaintiffs must occur by **APRIL 16, 2009**.

    3.    Defendants must immediately cause complete images to be made of *all* electronic information resident on *any* computer, Blackberry, PDA, cell phone or other electronic storage medium in their possession, custody or control regardless of whether the device is or was a UHW device and regardless of whether the device was or is privately owned or acquired. The imaging must include *all* information, not just UHW information. A procedure will be provided to sort private and/or privileged material from UHW material. The images and the devices must be retained by Attorney Dan Siegel for safekeeping pending further order. Written notification of compliance must be given on a name-by-name basis to plaintiffs' counsel by **APRIL 16, 2009**.

    4.    No later than **APRIL 16, 2009**, Attorney Siegel shall provide counsel for UHW copies of all UHW information referenced above save only those for which a good-faith assertion of privilege is made and/or for which it appears conclusively that the subject matter is wholly private with no relationship

7

to UHW.  Any withheld material shall be catalogued and identified in a log in accordance with Paragraph 16 of the Supplemental Order, said log also to be supplied by April 16.  By **APRIL 16**, Attorney Siegel must bear the burden to bring a motion for protective order before Magistrate Judge Maria-Elena James to justify withholding of any privileged material.  The burden to obtain wholly private information, however, shall be on plaintiffs.

5. The foregoing temporary restraining application applies against the National Union of Healthcare Workers and the following individual defendants:

| | | |
|---|---|---|
| John Borsos | Aaron Brickman | Gail Buhler |
| Will Clayton | Joan Emslie | Glenn Goldstein |
| Mark Kipfer | Gabriel Kristal | Paul Kumar |
| Barbara Lewis | Freja Nelson | Fred Seavey |
| Ian Selden | Sal Rosselli | John Vellardita |
| Phyllis Willett | | |

6. All deadlines are at noon of the date stated.

\*         \*         \*

Under Rule 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The briefing has overlooked this issue.  Nevertheless, the Court feels that security is required.  In the Court's judgment, a bond of $50,000 will be sufficient to cover such costs and damages.  This bond must be posted by **APRIL 14, 2009, AT NOON**.  The TRO, however, is effective immediately.  Attorney Dan Siegel is hereby ordered to provide each defendant subject to the TRO with a copy thereof within 24 hours of issuance of this order and to direct them to read it.

\*         \*         \*

8

For the preliminary-injunction hearing, the parties have agreed on the following schedule, hereby adopted by this order (all deadlines are at noon).

1. By **APRIL 16, 2009**, both sides shall answer the interrogatories propounded by the Court and appended hereto.

2. Between **APRIL 20 AND MAY 15, 2009**, each side may take up to ten 3-1/2-hour depositions, not limited to parties, in alternating weeks as agreed at the hearing. The individual defendants, if selected for deposition, shall bring to their depositions all UHW property in their possession, custody or control. Note that, by this stage, all such materials should have been turned over to Attorney Dan Siegel, who shall bring them to the deposition. Narrowly tailored subpoenas duces tecum may be served on non-parties.

3. By **JUNE 1, 2009**, plaintiffs shall file and serve their opening memorandum which shall be organized by facility, by individual defendant, and by item allegedly taken or hidden by said individual defendant and shall quote verbatim all evidentiary passages showing guilt. To accommodate this format, plaintiffs may have up to forty pages. Plaintiffs may also submit up to twenty additional (double-spaced) declaration pages — but no more (in light of the vast number already submitted).

4. By **JUNE 15, 2009**, defendants may oppose, using up to 55 pages and twenty pages of declarations and using the same format for presentation and organization.

5. By **JUNE 22, 2009**, plaintiffs may reply using up to fifteen pages of memoranda and no additional declarations.

6. A hearing will be held at **8:00 A.M. ON JULY 15, 2009**.

7. All discovery disputes have already been referred by an earlier order to Magistrate Judge Maria-Elena James. Counsel are required to bring all discovery motions in time to still meet the stipulated schedule above, taking into account the time Magistrate Judge James must have to decide. Put differently,

9

please do not ask for relief from the schedule because no discovery ruling has yet been obtained.

**IT IS SO ORDERED.**

Dated:  April 8, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE