IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, DAVID REGAN and ELISEO MEDINA, as trustees for SEIU UNITED HEALTHCARE WORKERS-WEST and fiduciaries of the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND, SEIU UNITED HEALTHCARE WORKERS-WEST, an unincorporated association and fiduciary of the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND, and REBECCA COLLINS, as a participant in the SEIU UNITED HEALTHCARE WORKERS-WEST AND JOINT EMPLOYER EDUCATION FUND,<br><br>    Plaintiffs,<br><br>  v.<br><br>SAL ROSELLI, JORGE RODRIGUEZ, JOAN EMSLIE, JOHN BORSOS, JOHN VELLARDITA, GABE KRISTAL, PAUL KUMAR, MARTHA FIGUEROA, BARBARA LEWIS, PHYLLIS WILLETT, DANIEL MARTIN, LAURA KURRE, RALPH CORNEJO, WILL CLAYTON, GLENN GOLDSTEIN, FRED SEAVEY, MARK KIPFER, AARON BRICKMAN, IAN SELDEN, GAIL BUHLER, FREJA NELSON, ANDREW REID, NATIONAL UNION OF HEALTHCARE WORKERS; MARYRUTH GROSS, CONNIE WILSON, ARLENE PEASNALL, CHERIE KUNOLD, FAYE LINCOLN, and DOES 1 through 100, inclusive,<br><br>    Defendants. | No. C 09-00404 WHA<br><br><br><br><br><br><br><br>**ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION** |

**INTRODUCTION**

    This action is a dispute between an international union and former officers and management in California who have formed a new rival union. A temporary restraining order

issued on April 8, and the parties stipulated to a discovery program followed by submissions on whether a preliminary injunction should issue. With the benefit of a better-developed record, this order finds that some provisional relief remains appropriate and a preliminary injunction will now be **GRANTED**.

**STATEMENT**

The basic circumstances of this case have been presented in previous orders. In brief, defendants were officers and leaders of the United Healthcare Workers, a California branch of the Service Employees International Union. In recent years, the leaders of UHW disagreed with the leadership of SEIU on various union policy matters. A central point of dispute, although certainly not the first, surrounded an organizational restructuring plan announced by SEIU in January 2008 to consolidate the long-term care workers of three SEIU local California branches into a single local. The plan would have removed 65,000 long-term care workers from UHW's jurisdiction (approximately 43 percent of the UHW membership) and placed them with a different organization. UHW leadership, not surprisingly, opposed the restructuring. SEIU ultimately approved the plan in January 2009.

In March 2008, as the policy disputes escalated, SEIU President Andrew Stern initiated proceedings under the union's constitution to determine whether UHW should be placed in trusteeship. He also appointed "monitors" to oversee (but not manage) UHW's affairs in the interim. Former Secretary of Labor Ray Marshall was appointed to preside over the union trusteeship hearings. The hearings took place in November and December 2008, and Secretary Marshall issued his report and recommendations on January 21, 2009. He recommended that UHW be placed into trusteeship unless its leadership acceded to the restructuring plan within five days. SEIU adopted the report and recommendations the following day.

The report also addressed various charges of impropriety that had been levied against the UHW leadership. UHW's leaders, it concluded, had engaged in "financial malpractice" when they transferred six million dollars in UHW funds to a nonprofit organization and $500,000 to an attorney trust account to be used to fund contests with the international union.

2

United States District Court
For the Northern District of California

The report, however, carefully hinged its trusteeship recommendations *solely* on UHW's obstinance to the restructuring, *not* on that misconduct.

On January 27, 2009, the trusteeship became effective. The trusteeship relieved UHW's leadership, defendants herein, of their management responsibility. In their stead, plaintiffs David Regan and Eliseo Median were appointed as trustees with authority under the union constitution to manage UHW's affairs. One day after the trusteeship, the individual defendants, already relieved of their management positions, resigned completely from the union and immediately formed a new and competing union, the National Union of Healthcare Workers. As defendants vacated their posts, stewards and rank-and-file members — who were already camped in UHW's offices — barricaded themselves inside the offices to resist the trusteeship. SEIU's new leadership was unable to enter for days. In the havoc of the transition, critical files were removed or destroyed or misplaced and other union property disappeared. The motion for injunctive relief is an effort to recover that property.

Plaintiffs filed this action in January 2009, and in March, after defendants had defected from UHW rather than resist the trusteeship, plaintiffs filed a seven-claim amended complaint. Two orders issued in May and June dismissed claim seven, a trade-secret claim, but otherwise denied multiple motions to dismiss filed by defendants and a summary judgment motion filed by plaintiffs.

A TRO issued on April 8. Based on a two-day evidentiary hearing and numerous declarations from both sides, the order concluded that plaintiffs had established a likelihood of success on their Section 301 claim for breach of the union constitution and likely irreparable harm from the missing property.

Since the TRO, defendants have relinquished some of the missing property to plaintiffs. Defendants turned over more than sixty boxes of documents, although only two defendants returned bargaining, grievance and arbitration files. As ordered in the TRO, electronic devices

3

1 were turned over to NUHW Attorney Siegel for imaging.[1] Moreover, on May 26, 2009, five
2 days before plaintiffs' opening preliminary injunction brief was due, defendants produced
3 approximately 550,000 pages of documents according to a discovery order, although the parties
4 dispute whether this production was complete.

5 Plaintiffs now argue that injunctive relief remains appropriate because not all property
6 covered by the TRO was returned. With the benefit of a record of three months of discovery,
7 this order finds that provisional relief remains appropriate. A preliminary injunction will issue,
8 albeit one more narrowly tailored than the TRO.

9 This order confirms the essential findings of the TRO — that, in the run-up to the
10 trusteeship, defendants "embarked on a vigorous resistance strategy, including a plan to disrupt
11 union operations so as to make the situation ungovernable" and, as they launched a new and
12 competing union, "filch[ed] or sabotag[ed] UHW property and information or aid[ed] and
13 abett[ed] others in doing so." Upon leaving UHW, the individual defendants took and
14 reproduced UHW property for use at NUHW and destroyed other UHW property in an effort to
15 hamstring their soon-to-be competitor.

16 For example, defendants concocted a scheme to prevent SEIU from smoothly retaking
17 the UHW offices. As stated, in the days leading up to the trusteeship and thereafter, UHW
18 offices were being occupied by stewards and rank-and-file members, a circumstance of which
19 UHW leadership was well aware. On January 17, 2009, ten days before the trusteeship, a memo
20 was drafted to UHW's security contractor for the Oakland office, ABC Security Service,
21 directing that "if someone from SEIU arrives and claims ownership of the building do not allow
22 them to enter and immediately contact the following individuals." Willett is the first-listed
23 individual, and defendant Kristal is also listed. The memo continued, "[t]he guard has been
24 provided with a copy of the deed showing that *SEIU does not own the building*" (emphasis
25 added). Similar memos were sent to the security contractors for the San Jose and San Francisco

---

[1] A subsequent order detailed the procedures by which the devices should be imaged. At the hearing, counsel represented that the devices have been imaged but they remain with Attorney Siegel because they have yet to be imaged in the precise manner required (although evidently, a few defendants have regained physical control over their devices).

4

1 offices. On January 22, the same day that SEIU adopted Secretary Marshall's report and
2 recommendations regarding the trusteeship, defendant Willett sent another letter to ABC
3 Security expanding on the theme.[2] Willett sent virtually identical letters to numerous other
4 vendors, including the providers of telephone, internet, parking and other services. These
5 letters were sent to vendors for the Oakland, Sacramento, San Jose, San Francisco and Los
6 Angeles offices. A template for the letter was emailed by defendant Borsos to defendant Martin
7 (Rosselli's assistant), who finally forwarded it to defendant Willett (Willett Dep. 47; Willett
8 Dep. Exhs. 63, 66; Vockrodt Decl.; Weinberg Decl. ¶ 2; James Decl. ¶ 6; TRO Tr. at 83).

9 The problem was that UHW, and by extension SEIU, *did* own the building. The deed
10 mentioned in the memo showed that an entity called Unity Healthcare Workers Corporation
11 held title to the building. Unity, however, was *owned by* UHW. It had no employees of its
12 own. At the TRO hearing, defendant Rosselli, one of the five members of Unity's board,
13 admitted that *UHW* did in fact control Unity (Vockrodt Decl.; Exh. 280; TRO Tr. at 83).

14 In addition to this scheme to prevent SEIU from gaining access to the buildings, in the
15 weeks leading up to the trusteeship defendants deleted files on their UHW computers on a
16 massive scale. Defendant Rosselli deleted more than 12,000 files from his computer. Directly
17 contradicting testimony he gave at the TRO hearing, an unrebutted analysis by plaintiffs'
18 vendor indicates that Rosselli "double deleted" a significant portion of these files, *i.e.*, he not
19 only deleted the files from where they were stored on his computer but also took the extra step
20 of deleting the files from the "deleted items" folder on his computer. According to the analysis,
21 this was not his ordinary practice before January 2009. Similarly, defendant Willett deleted just
22 under 3,000 files and deleted her contact list. Defendant Seavey deleted approximately 5,400
23 Outlook files. Defendant Kumar deleted 16,279 Outlook files and 100 percent of the files
24 stored on network storage location on UHW's server. Defendant Kurre deleted 9,013 Outlook
25 files and 94 percent of the material stored on her network file. Defendant Lewis deleted 85

---

[2] The January 22 letters stated, for example, "[w]e are writing to inform you that we have reason to believe that you may receive an attempt by individuals, claiming to have the right to do so, to change or cancel the security services . . . . These premises are owned by Unity Healthcare Workers Corporation and only Lynn Templeton and the undersigned individual [*i.e.*, Willett] . . . have the right to execute any change in the service at the premises."

5

1  percent of the material on her network file.  Defendant Figueroa deleted 42 percent of the
2  material on her network file during that time.  Defendant Borsos "double deleted" *all* of the
3  emails he received in 2008 and 2009 prior to the trusteeship (Vockrodt Decl.; Hauptman Dep.
4  129–31 & Exhs. 20, 24; Willett Dep. 96–98, TRO Tr. at 136).[3]

5  In the run-up to the trusteeship, several defendants including defendants Rosselli,
6  Borsos, Goldstein, Vellardita, Martin and others made frequent use of a "shadow" email
7  network.  That is, defendants used private email accounts off of the UHW server to
8  communicate with each other.  To notify each other of messages sent to these private accounts,
9  defendants frequently sent messages on their UHW emails saying nothing more than, for
10 example, "check personal email."  Any communications for UHW business are the property of
11 UHW, even if sent through a personal email account.  The dispute regarding the personal emails
12 is currently before the discovery magistrate judge (Vockrodt Decl; Vellardita Dep. Exh. 229;
13 Seavey Dep. Exh. 240; 2nd Rothner Decl.).

14 Additional property was taken.  The record demonstrates that defendants copied
15 voluminous UHW files (electronic and paper) before departing their posts and sent electronic
16 files from their work email to their own personal email addresses.  Computers and other office
17 equipment were seen being carted out of the Sacramento office.  In the Oakland office,
18 defendant Vellardita and defendant Kristal, who reported to Vellardita, both reported their
19 UHW laptops as stolen just days before the trusteeship (and within a day of each other).  A third
20 individual who reported directly to Vellardita told an information technology director that she
21 was "thinking of" reporting her computer stolen, although she ultimately decided not do so.

---

[3] The analysis conducted for the computers of defendant Rosselli and others could not be conducted for defendant Borsos' computer because he, unlike other UHW staff, did not use a UHW server for his UHW email. Instead, his email was hosted by a company called Intermedia Net — paid for by UHW.  Although UHW backed up its own email servers, Intermedia preserved back-up tapes for only seven days, rendering analysis of his pre-trusteeship deletions impossible.  After the trusteeship, UHW obtained Borsos' email files from Intermedia and thus discovered that all emails sent *to* Borsos were missing for 2008 and 2009.  Again, the evidence tends to contradict Borsos' testimony at the TRO hearing.  When asked if his emails were hosted by Intermedia, which did not back up his email, rather than UHW's servers, he stated that he "ha[d] no idea" and did not know who Intermedia was.  The evidence suggests otherwise.  UHW's information technology department had "several times" contacted Borsos to schedule a time to transfer his email from Intermedia to UHW's own server.  One such email in December 2008 stated "[c]an we schedule an hour so we can get you off Intermedia and on to our blackberry and email server?"  Borsos responded — "yep."  The IT department, however, was never able to schedule the necessary appointment (Hauptman Dep. 137–41; TRO Tr. at 167).

6

1  This was an unlikely coincidence.  Defendants also took membership lists.  For example,
2  defendants also organized a series of "mass meetings" in San Francisco, Sacramento and Fresno
3  on January 24, 2009, the purpose of which was, at least in part, collect updated membership
4  information.  At the mass meetings, attendees were given yellow cards on which they were to
5  provide their contact information.  While the normal practice would be to return sign-in sheets
6  or other member contact information to UHW offices in order to update the union's
7  membership lists for future use, in this instance the yellow cards were not returned, were not
8  entered into UHW's system, and remain missing.  Instead, the cards were taken and later used
9  by NUHW (Goldstein Dep. 120–25; Goldstein Decl. ¶ 4; Wong Decl.; Vellardita Dep. 120;
10 Torres Decl.; Ortega Dep. Exh. 145).

11 In short, the record provides considerable evidence of defendants' scheme in
12 anticipation of the trusteeship to collect UHW property and resources to be used to create the
13 new union, NUHW, while leaving behind as little as possible for the incoming trustees to use to
14 manage UHW.  This order finds that ongoing provisional relief remains appropriate and a
15 preliminary injunction will issue, albeit one more narrowly tailored than the TRO.

**ANALYSIS**

Injunctive relief is appropriate where the plaintiff establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365, 376 (2008).

Plaintiffs' motion is predicated on three of their six remaining claims:  a contract claim for breach of the union constitution — actionable under Section 301 of the Labor Management Relations Act — as well as state claims for breach of fiduciary duty and for breach of confidentiality agreements executed by all defendants.

The union constitution provided as follows:

> *Article VIII, Section 7(b)*: "The Trustee [appointed pursuant to Section 7(a)] shall be authorized and empowered to take full charge of the affairs of the Local Union or affiliated body and its related benefit funds, to remove any of its employees, agents and/or trustees of any funds selected by the Local Union or affiliated body and appoint such agents, employees or fund

7

> trustees during his or her trusteeship, and to take such other action as in his or her judgment is necessary for the preservation of the Local Union or affiliated body and for protection of the interests of the membership."
>
> *Article VIII, Section 7(c)*: "Upon the institution of the trusteeship, all moneys, books and property of the Local Union or affiliated shall be turned over to the Trustee."
>
> *Article VIII, Section 7(e)*: "The Trustee shall take possession of all the funds, books, papers and other property of the Local Union or affiliated body . . . ."

This order carries forward several governing principles from the TRO. This order, like the TRO, is anchored in the fundamental principle that all communications, information or property made or acquired by any officer or employee of UHW in the course of his or her employment belonged and still belongs to UHW. This would include notes, emails, letters, memos, forms, post-its, badges, photographs and so on — any *information* however recorded, and any *property* however embodied. This would also include any and all information pertaining to the UHW resistance scheme, for all of that was — up until the moment of the trusteeship and notice thereof — done in the course of employment for UHW. Moreover, any distinction between "official property" versus other materials is once again rejected for the reasons stated in the TRO.

Also like the TRO, however, this order stops short of barring defendants from "using" such information for the reasons stated in the TRO. To reiterate, defendants may not ultimately retain electronic or hard copies belonging to plaintiffs. They may ultimately "use" only what they happen to have remembered. Being now only at the provisional stage, however, this order will not require all property to be returned now. It will require immediate return only of files as to which irreparable injury has been shown.

Finally, the following definitions articulated in the TRO are adopted once again. "UHW information" means information communicated or acquired by any UHW officer or employee in the course of his or her employment. "Electronic UHW information" means such information stored in electronic form, such as e-mails, text messages, voice mails, digital photographs or videos and word-processed documents. "Non-electronic UHW information" means all other UHW information. "UHW property" includes all "UHW information" as well as any other item

8

purchased with UHW funds or acquired for UHW purposes by any officer or employee of UHW.

\*          \*          \*

For injunctive relief to be appropriate, plaintiffs must establish probable success on the merits and a likelihood of irreparable harm. That is, plaintiffs must show not only that defendants took or destroyed UHW property but also that the heist was of property that will result in irreparable harm absent ongoing injunctive relief.

Based on the voluminous record submitted in support of the motion, this order finds that plaintiffs have made the requisite showing for certain UHW bargaining, grievance and arbitration files. Plaintiffs have established a likelihood of success on their claim that these files were taken by or at the behest of defendants and have yet to be returned, and that plaintiffs are irreparably harmed because the missing files hamper UHW's representation of its members and place the union at a disadvantage *vis a vis* its new competitor, NUHW. Although plaintiffs have made a strong showing that filched property was not limited to bargaining, grievance and arbitration files, however, this order concludes that plaintiffs have failed to establish a likelihood of irreparable harm as to other missing property pending trial.

### 1. BARGAINING, GRIEVANCE AND ARBITRATION FILES.

Plaintiffs are still missing bargaining, grievance and arbitration files from the Oakland and Sacramento offices for Kaiser, the Sutter group of hospitals, and from UHW's convalescent-home division.

UHW's Kaiser division was based in Sacramento. The bulk of UHW's Kaiser files remain missing from that office and, this order finds, plaintiffs have established a strong likelihood that the files were taken by or at the behest of defendants. The Sacramento office was among those being occupied by rank-and-file members in the run-up to the trusteeship. When the trustees were able to re-enter the office, the office had been "stripped." Jacob Pridgen-Daniels was the UHW office manager in Sacramento. He was the last *employee* to leave the office after he, like the other staff, was placed on administrative leave on January 28 (the offices were still being occupied by stewards or rank-and-file members when he left).

9

United States District Court
For the Northern District of California

1  When he returned to work from administrative leave February 9, he saw that the Kaiser-division
2  offices had been completely cleared of files. Similarly, Nancy Herrera-Barrett worked as a field
3  representative and organizer in the Kaiser division in Sacramento. She kept two shelves of
4  Kaiser documents behind her desk including signed letters of agreement and bargaining
5  materials. She also kept an organizer full of active grievance files, a larger file of closed
6  grievances and pending arbitration files, and a crate of information regarding steward elections
7  among other materials. She was in her office on January 27, 2009, the day the trusteeship was
8  imposed. She also was placed on administrative leave and left the office around 8:00 p.m. on
9  January 27. All her files were in order. On January 30, she received a report that the
10 Sacramento Kaiser Division office had been stripped. She asked about her files and was told
11 that they too were all missing. When she returned to work from administrative leave in mid-
12 February, sure enough, she confirmed that the office had been stripped and all of her files were
13 missing (Herrera-Barrett Decl.; 2nd Herrera-Barrett Decl. 80 ¶¶ 5–6, 11–14; Pridgen-Daniels
14 Decl.).

   Plaintiffs are also still missing bargaining and grievance files for numerous
convalescent-home facilities, files that were located in the Oakland as well as Sacramento
offices.[4] Lisa Gude has been a deputy UHW trustee since the imposition of the trusteeship and
is responsible for convalescent facilities, the position formerly held by defendant Vellardita. In
her declaration, she states that — even after the TRO — UHW is still missing bargaining files
for 37 nursing-home facilities and is still missing grievance files for many more nursing-home
facilities (2nd Gude Decl. ¶ 3):

> The bargaining representatives for 30 of those facilities prior to
> the trusteeship were [defendants] John Vellardita, Gabe Kristal
> and Mark Kipfer, who were based out of the Oakland office. The
> former bargaining representative for the other seven facilities,
> Marti Garza [not a defendant] was based out of the Sacramento
> office. Our numerous requests to each of these individuals to
> return any bargaining materials in their possession were
> unanswered . . . . The only bargaining files that have been

---

[4] Although the declarations regarding the Kaiser files in Sacramento office referred to "bargaining, grievance and arbitration files," other declarants referred only to "bargaining and grievance files," a circumstance that explains why some passages above use one phrase rather than the other.

10

United States District Court
For the Northern District of California

> recovered are those returned by Mr. Kipfer on April 16, 2009, pursuant to the Court's TRO.
>
> \*             \*             \*
>
> As the contracts for these 37 facilities were open at the time that the trusteeship was imposed, there was a clear expectation that bargaining would be underway, and that bargaining files would either be returned by the former bargaining representatives or found in the office of the former bargaining representatives. Even before actual negotiations begin, there would necessarily have been a large amount of research material (costing of wages and costing of health insurance, for example) to prepare the UHW bargainer for a negotiation with the employer.
>
> Only a very limited number of grievance files have been found regarding any of the approximately 150 nursing home facilities at which UHW represents workers, and even those that were found were all so old that the opportunity to process those grievances had passed.

Finally, UHW's bargaining and grievance files for the Sutter group of hospitals remain missing from the Oakland office. Carrie Ciancetti was employed with UHW both before and after the trusteeship and, since the trusteeship, has been overseeing employee relations with the Sutter hospitals. She states that, even after the deadline in the TRO for the return of UHW's files, "[w]e have not found or succeeded in securing the return of anything that looks like a complete record of bargaining for even one Sutter facility." Although "it has been impossible to catalog what is missing precisely because it is missing," she explains, UHW is still missing all or part of numerous files (2nd Cianchetti Decl. ¶¶ 2–5):

> We have not found or received any bargaining materials pertaining to Sutter Delta . . . . For [eight other] Sutter facilities, we have been able to reconstruct a limited amount of materials by relying on information from employers and a small amount of information we were able to piece together, but nothing close to a full file depicting the state of negotiations . . . .
>
> The bargaining files for each of the Sutter facilities should have been found in the Oakland office, as the lead bargaining representatives on the Sutter team prior to the trusteeship were all based out of the Oakland office.
>
> We were not left with complete grievance files for the Sutter facilities. Members have called about grievances for which we have no record in a number of facilities including: Solano, Alta Bates, California Pacific Medical Center and Santa Rosa.

11

Based on the record, this order finds that plaintiffs have established a likelihood of success on their claim that these bargaining, grievance and arbitration files were taken by or at the behest of defendants and have yet to be returned.

Defendants insist that plaintiffs themselves may have been the cause of the missing files because plaintiffs could have discarded or misplaced the files. When SEIU assumed control of the UHW offices, defendants contend, its staff discarded "clutter" and removed some files to an off-site location in Alameda, and files could have been lost in the process. Defendants also point to an instance in May 2009 when plaintiffs mailed a box of bargaining files, grievance files and other material to one of the defendants, Andrew Reid (Siegel Decl. ¶ 3; Cianchetti Tr. at 73).

Defendants' version of events is rejected. Although plaintiffs themselves may be responsible for some *small* portion of the missing files, as the May 2009 incident suggests, this order finds that plaintiffs have established a strong likelihood that responsibility for the vast majority of the missing files lies with defendants. *First*, eyewitness accounts indicate that it was not *plaintiffs* who removed the files in the wake of the trusteeship. Ryan Juergenson was a security guard with ABC Security and was assigned to the Sacramento office. When he first reported to the Sacramento office on January 26, 2009, he saw that a number of individuals were sleeping in the offices. On the afternoon of January 30, the individuals who were sleeping in the offices began packing items into boxes. They told him they were packing "personal items," but he saw them pack at least twenty boxes into a minivan — numerous times the minivan was filled with boxes, driven away, returned emptied, and refilled. Most of the boxes were closed, but a few did not have lids and Juergenson was able to see that they contained files, documents and some computer equipment. The boxes were being carted from the north-west corner of the building which, he later learned, housed the Kaiser division including Herrera-Barrett's office (Jurgenson Decl. ¶¶ 1–6).

This occupation of the buildings, moreover, was not a spontaneous uprising by rank-and-file members but rather part of a coordinated scheme. Defendant Cornejo, the director of UHW's Kaiser division in Sacramento, facilitated the occupation of that office. He

12

authorized UHW expenditures to supply provisions to the individuals occupying the Sacramento office, including UHW expenditures for the purchase of air mattresses. Moreover, Jason Johnson, a staff director who reported directly to Cornejo, held meetings with UHW staff to describe the plan of action upon imposition of the trusteeship. The plan involved using stewards — rather than UHW staff — to occupy the buildings in order to distance UHW staff from the events. Sympathetic stewards from each facility were designated and, upon news of the trusteeship, they were to be contacted *via* pre-planned phone trees. Shortly after the trusteeship, while the office was still under occupation, Johnson was overheard instructing someone over the phone to "[t]ake everything out of the office, down to the last post-it, paper-clip and pencil" (Winslow-Beavers Decl. ¶ 2; Herrera-Barrett Decl.).

  *Second*, the record confirms that *some* defendants *did* take UHW bargaining and grievance files upon leaving UHW for NUHW. After the TRO, two defendants — and, evidently, only two — surrendered UHW bargaining and grievance files. Defendant Kipfer was an assistant director at UHW who worked with the convalescent facilities. He reported to defendant Vellardita. After the TRO issued, Kipfer returned two boxes of active bargaining files, including the active files for Evergreen and Foresight. This belied the earlier declaration he had submitted in opposition to the TRO which had stated "[w]hen I left my office on January 27, to the best of my knowledge the bargaining files that I had worked with, including Evergreen and Foresight, were still at my workstation where I typically kept them." Similarly, defendant Freja Nelson returned eight boxes of documents, including two boxes of current collective-bargaining files, after the TRO. Although defendants Kipfer and Nelson have returned files, it is simply implausible based on the totality of this record that these two defendants were acting in isolation and that no other defendant took files. Critically, these two defendants — the only two that have returned bargaining and grievance files — have both *left* NUHW after brief stints with the new union, not likely a coincidence (Webb Decl.; Gude Decl. ¶¶ 2–5; Kipfer Decl. ¶ 3; NUHW Decl. 191–92).

  *Third*, the overall record points to a coordinated and broad-based scheme to take and destroy UHW property and information including bargaining, grievance and arbitration files,

upon leaving UHW for NUHW.  The above-described evidence that defendants deliberately sought to prevent SEIU from entering the buildings, aided the occupiers, and engaged in wholesale deletion of electronic files just before the trusteeship, among other evidence, lends credence to the inference that defendants (or those working on their behalf) made off with the files.

*Fourth*, defendants' blanket denials lack credibility.  In addition to Kipfer's about-face regarding bargaining files, as explained above, other defendants have already been forced to backtrack from their own prior statements regarding the deletion of electronic files, the extent to which UHW files in their possession were returned after the TRO, and other matters.  In sum, this order finds that defendants and others working at their behest are responsible for the vast majority of the missing files.  This order finds that plaintiffs have established a likelihood of success on their claims that defendants or those working on their behalf took the above-described bargaining and grievance files upon leaving UHW for NUHW.

*          *          *

Plaintiffs have established irreparable harm from the above-described bargaining, grievance and arbitration files.  This order rejects defendants' argument that even if defendants *did* take the files, plaintiffs are not thereby harmed.

Defendants emphasize that not all of the facilities for which files are missing are in active bargaining.  For example, defendants brush aside the looting of the Kaiser files with the argument that "Kaier has a contract in place so that is not a problem."  Some of the files, however, *are* active.  UHW has been in active bargaining with Sutter on various issues.  Moreover, facilities that are not now in active bargaining can be expected to become active.  As explained, the convalescent-home facilities have open contracts — the contracts having been terminated by *defendants* soon before departing UHW.  Although UHW may have a contract in place with Kaiser, as explained, the looted files also included *active* grievance files and other materials.  Plaintiffs clearly suffer harm from the missing active grievances:  plaintiffs have been unable to process grievances of their members.  Moreover, the harm to UHW is not limited only to files for facilities in active, ongoing bargaining.  Plaintiffs need their files for any

14

1 number of reasons, including to prepare for future bargaining or as a reference to draw on in
2 related matters. A large organization such as UHW cannot function normally without its critical
3 business files.

4 Defendants also argue that plaintiffs are not harmed by the missing files because
5 plaintiffs have endeavored with some degree of success to piece together files and move
6 forward with union business. To the extent plaintiffs have recreated their files, they have done
7 so by relying in large part on information provided by the very employers *with whom they are*
8 *bargaining*. They understandably do not have full confidence in the files thus created. In all
9 respects, plaintiffs' files are still incomplete. It is also irrelevant that plaintiffs may also have
10 encountered *other* difficulties since the trusteeship such as mobilizing members or stewards.
11 They are clearly harmed by being deprived of important bargaining and grievance files.

### 2.  OTHER PROPERTY.

Plaintiffs have presented a strong case that the heist of UHW property extended beyond the above-described bargaining, grievance and arbitration files. As stated, plaintiffs provide evidence that a broad range of UHW property was taken and has yet to be returned or was destroyed — including computers and other office equipment, emails sent or received on personal email accounts pertaining to UHW business, UHW electronic files reproduced and removed as defendants left UHW for NUHW, deleted emails and electronic files, and the yellow cards containing updated membership data created at the January 24 meeting. Plaintiffs have failed, however, to establish a likelihood of irreparable harm from this missing property absent injunctive relief. Unlike the bargaining, grievance and arbitration files, this information lacks immediate criticality. Perhaps this information will be the subject of a later permanent turn-over order after trial but, for now, the showing does not warrant employing the contempt power. For this reason, injunctive relief will be limited to the above-described Sutter, Kaiser and convalescent-home bargaining, grievance and arbitration files.

*     *     *

The balance of equities, this order finds, tips in plaintiffs' favor. Plaintiffs are harmed on an ongoing basis by the absence of the bargaining, grievance and arbitration files, whereas

United States District Court
For the Northern District of California

15

1 defendants will not be prejudiced by an injunction forcing them to return them. The public
2 interest lies only in ensuring that union business is carried out within the confines of the law, an
3 interest which similarly will be advanced by injunctive relief.

4 For all of these reasons, injunctive relief remains appropriate. Plaintiffs have
5 demonstrated a likelihood of success on the merits of their Section 301 claim to recovery
6 property, and they have demonstrated likely irreparable harm arising from the missing Sutter,
7 Kaiser and convalescent-home files. The harm arising from plaintiffs' inability fully to
8 represent their members in the interim cannot be reversed. The harm is heightened by
9 defendants ill-gotten advantage in their competition with plaintiffs for the hearts and minds of
10 membership.

11 This order recognizes that it does not immediately require the return to UHW of any and
12 all UHW property. The reason is that this is an order on a motion for preliminary injunction
13 and the record does not demonstrate irreparable injury as to any and all property. Provisional
14 relief will therefore be limited to the missing Sutter, Kaiser and convalescent-home files.

## CONCLUSION

16 Consequently, defendants are **ORDERED** to do the following:

17 1. All defendants must immediately turn over to plaintiffs via Attorney
18 Siegel all originals and all copies of the Sutter, Kaiser and convalescent-home
19 bargaining, grievance and arbitration files in their possession, custody or control.
20 They also must recover all such files that were once in their possession, custody
21 or control but were given to someone else (and then turn them over to plaintiffs
22 via Attorney Siegel). Each defendant also must file a detailed declaration, under
23 oath, stating that he or she has read this order and explaining the full extent of
24 his or her information, whether hearsay or otherwise, as to the current or past
25 whereabouts of any such file and in whose possession, custody or control the
26 files were and are located and the full extent of his or her compliance with this
27 order. Full compliance with this paragraph is required by **AUGUST 7, 2009, AT**
28 **NOON**.

2. Defendants must continue to preserve any and all UHW property within their possession, custody and control and continue to comply fully with Paragraph 4 of the Supplemental Order to Order Setting Initial Case Management Conference in Civil Cases Before Judge William Alsup (an order both sides must honor).

3. Finally, all defendants in this action remain subject to paragraph three of the TRO and subsequent orders regarding the imaging of electronic deices. Any device covered by paragraph three of the TRO not currently in the custody and control of Attorney Siegel must be immediately turned over to Attorney Siegel for safekeeping until and unless it has been imaged as required. This order applies to *all* individual defendants, including defendants Martin, Rodriguez, Figueroa, Kurre, and Cornejo who were not subject to the TRO because they have now been served and have had ample time to respond. This obligation is grounded in the district court's authority to manage civil discovery including the preservation of evidence, independent of the merits and the usual provisional relief standards.

**IT IS SO ORDERED.**

Dated: July 27, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE